**Opinion issued January 28, 2021**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

**NO. 01-19-00102-CV**

————————————

**JONATHAN ELIAZAR MERLO, Appellant**

**V.**

**VICTOR MANUEL LOPEZ, Appellee**

---

**On Appeal from the 309th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-66223**

---

## MEMORANDUM OPINION

After a bench trial, the trial court awarded appellee Victor Manuel Lopez an annulment of his marriage to appellant Jonathan Eliazar Merlo based on fraud. On appeal, Merlo contends (1) the judge who presided at trial improperly filed findings

of fact and conclusions of law after her term expired and (2) the evidence was legally insufficient to support an annulment.

We affirm.

## Background

In December 2015, Merlo, a resident of Nicaragua, and Lopez, a resident of the United States, met online. After corresponding for a few months, Lopez traveled to Nicaragua to meet Merlo in person. The men decided to continue their relationship, later became engaged, and obtained a K-1 visa for Merlo to enter the United States as Lopez's fiancé.[1] They married in January 2017.

Within a year, both Lopez and Merlo sought to end the marriage. Lopez initially petitioned for a divorce but later amended his pleading to request an annulment due to fraud on the part of Merlo. Merlo counter-petitioned for a divorce, alleging that the marriage had become insupportable, that Lopez was guilty of cruel treatment, and that since the marriage, Lopez had been jailed on a felony conviction.

### Trial proceedings

In October 2018, the parties tried the issue of whether their marriage should be annulled or a divorce granted to the bench, the Honorable Sheri Dean presiding.

---

[1] Generally described, the K-1 visa is a nonimmigrant visa category which covers the fiancé(e) of a U.S. citizen and permits the fiancé(e) to travel to the United States to marry his or her citizen sponsor. *See* 8 U.S.C. § 1184(d).

The only two witnesses were Lopez and Merlo.[2]

Lopez testified that he fell in love with Merlo, provided financial support to Merlo in Nicaragua, and ultimately paid "thousands of dollars" to obtain Merlo's K-1 visa. Merlo arrived in the United States in November 2016 and lived with Lopez in the home of Lopez's brother. Because the K-1 visa allowed Merlo to be present in the country only if the men married within 90 days,[3] a wedding was planned for January 21, 2017.

Lopez called off the engagement on the day of the wedding because he believed that Merlo was in contact with another man online. According to Lopez, Merlo responded violently to the wedding being called off and struck Lopez. Merlo called the police, and Lopez was arrested. At the time of trial, an assault charge was still pending against Lopez as a result of the altercation.

Lopez's brother asked Merlo to leave his house as a result of the altercation, and Merlo stayed in a homeless shelter. Two nights later, Lopez asked Merlo to

---

[2]     The reporter's record of the trial proceedings is not long. The trial testimony is transcribed in fewer than seventy pages, and the eight exhibits admitted into the evidence occupy another sixteen pages of the reporter's record.

[3]     *See id.* § 1184(d)(1) (requiring petitioner for K-1 visa to submit evidence that parties "are legally able and actually willing to conclude a valid marriage in the United States within a period of ninety days after the alien's arrival" or else "said alien . . . shall be required to depart from the United States").

return home. Lopez and Merlo agreed to continue with their plan to marry and ultimately were married on January 28, 2017.

During his testimony, Lopez was asked about a letter signed by Merlo a few days after the altercation. The letter, which was addressed to the district attorney and purported to be for the purpose of clarifying what happened in the altercation, stated:

> I Jonathan Merlo would like to clarify what happened Sunday (01/22/17) morning. After having a disagreement earlier in the day Saturday (01/21/17) with Victor M. Lopez in regards to our relationship[,] I was confused, hurt and agitated with him. Late at night, I brought up our disagreement in regards to our relationship. I knew the timing was not right but I was not happy with our wedding being called off on the day of Saturday (01/21/17). . . . After many words being exchanged, I attempted to punch Victor in his face. . . . I did not want Victor Manuel to be arrested nor have a restraining order against him because I do not consider him a danger to me. At this point, I would like to take the opportunity to make things right and be honest. I do not want to press charges, nor do I believe the State should pursue charges for an assault that never occurred. For this I apolog[ize], to you, the State of Texas, and all who was involved, especially Victor M. Lopez. . . . I ask that you accept this hand delivered and signed statement as a for[m] of a non-prosecution letter.

Merlo also signed an "affidavit of non-prosecution," averring that he made the non-prosecution request voluntarily and not due to any coercion or threat against him. Lopez acknowledged that he asked Merlo to sign the letter and affidavit based on the recommendation of the attorney representing him in connection with the assault charge. In Lopez's view, Merlo did not want to press charges because he "was adamant he wanted to get married."

4

Lopez believed Merlo was dishonest about his desire for a long-term relationship. Although Lopez was unaware of it at the time, Merlo signed a handwritten "Complainant Statement," which was dated February 21, 2017 and drafted on a Harris County Constable's form. The statement reads:

> Me and my fiancé[ ] started arguing at 5 am cause he was intoxicated. He was drinking during the whole night and he tried to hit me when we wen[t] to the room. I yelled to his . . . brother . . . for help. Then we started arguing worse and he spit[ ] at my face when I tried to protect me[,] he started hitting me with his hand closed, on my face, when I saw the blood I started running outside. None of the persons helped me, not even his brother. He grabbed my arm and hurt[ ] me. I had to call 911 from the neighbor's house, his brother and my fiancé[ ] left right after he beat me. He caused me pain and injury.

Lopez learned of this later, and at trial he testified that Merlo "was lying to me the whole time. . . . In January he wanted to marry me, but behind my back in February, he's writing these statements to the sheriff to get me arrested."

The parties lived together until March 30, 2017, when Lopez was convicted of driving while intoxicated (third offense) and sentenced to six years' confinement. Lopez described Merlo as supportive during the DWI trial. Initially Merlo stayed in contact with Lopez by telephone and visited him in jail on weekends. But their last contact was by telephone on May 5, 2017. According to Lopez, Merlo said: "Well, I married you. I got what I wanted." And Merlo admitted that the only reason he married Lopez was to "get his immigration paperwork." Lopez was informed by his mother that Merlo had picked up an employment authorization form the day before

5

and moved out of the home he had shared with Lopez. Lopez claimed he was "shocked," "felt betrayed," and had been "lied to and used" by Merlo.

Lopez further testified that although he had not been in contact with Merlo since the May 5 call, he was served in jail with a copy of a protective order obtained by Merlo in August 2017. When he received the protective order, Lopez concluded that he had been defrauded by Merlo and decided to end the marriage.

Merlo testified that he was working as a nurse in Nicaragua and supporting himself when he met Lopez online. As the men began to correspond daily, Lopez offered to pay for upgraded internet and phone services for Merlo. Merlo stated that he fell in love with Lopez when Lopez visited Nicaragua. Lopez proposed marriage after the trip, even though the men had not yet discussed it. Merlo had not planned to move to the United States, but he agreed because Lopez did not want to live in Nicaragua. According to Merlo, Lopez persuaded him that the United States would afford the couple better opportunities and that Merlo would be embraced by Lopez's family. Merlo acknowledged that he had been denied a tourist visa before he and Lopez applied for a K-1 visa. When Merlo obtained the K-1 visa, he was also authorized to work in the United States.

Merlo recalled that Lopez called off their original wedding date because "he needed more proof that [Merlo] loved him, and he told [Merlo] that he was going to wait." Lopez then drank heavily with friends at the home they shared with Lopez's

brother. Merlo did not drink any alcohol, which caused Lopez to become angry. Lopez began fighting with Merlo and attempted to strike Merlo. Merlo called out for help. Although Lopez's brother and his brother's partner witnessed Lopez slap Merlo twice, they did not offer any help. Lopez then punched Merlo on the head and in the stomach. Lopez's brother "threw" Merlo out of the house, and Merlo called the police from a neighbor's house. Before the police responded, Lopez and his brother left the home. They were later located by the police, and Lopez was arrested.

Merlo explained that he gave a handwritten "Complainant Statement" on the night of the January altercation. But he misdated the handwritten statement as having been signed in February 2017. Merlo attributed this error to being confused and hurt at the time he wrote the statement.

After being kicked out of the home as a result of the altercation, Merlo decided to return to the relationship because he was in love with Lopez. He lived with Lopez until Lopez began his six-year sentence. Merlo stated that he did not want Lopez to go to jail and did not believe that Lopez would serve the full six-year sentence. Although he and Lopez initially talked on the phone during Lopez's incarceration, Lopez began to harass and threaten Merlo with violence over the phone. Out of fear, Merlo moved out of the home and obtained a protective order.

Merlo acknowledged signing the letter and affidavit of non-prosecution, but he denied authoring the letter and the accuracy of the statements in the letter. Merlo

7

testified that Lopez's brother had drafted the letter, and Merlo signed at Lopez's request because he trusted Lopez.

### *Post-judgment proceedings*

On November 14, 2018, Judge Dean found in Lopez's favor and signed a decree of annulment. The decree recited her findings that Merlo "used fraud to induce [Lopez] to enter into the marriage"; that Lopez had not "voluntarily cohabitated with [Merlo] since learning of the fraud"; and that the marriage was therefore "voidable and subject to annulment."

Merlo timely requested findings of fact and conclusions of law and, when none issued, filed a timely notice of past due findings and conclusions, extending the trial court's deadline until January 14, 2019. But Judge Dean's term expired on December 31, 2018, the same day Merlo filed a notice of past due findings and conclusions, and Judge Dean did not file any fact findings or legal conclusions before she left the bench or by the January 14 deadline.

Merlo also moved for a new trial on several grounds, including that the fraud finding underlying the annulment lacked sufficient evidentiary support and that newly discovered evidence supported Merlo's testimony about misdating the handwritten statement claiming Lopez was the first aggressor in the pre-marriage altercation. At the new-trial hearing conducted by the now-presiding judge, the Honorable Linda Marie Dunson, Merlo also complained that no findings or

conclusions had been filed. The trial court denied the motion for new trial but indicated that Judge Dean would file the findings and conclusions.

Merlo appealed. On September 20, 2019, nearly a year after the trial and two months after Merlo filed his opening brief on appeal, Judge Dean made these findings:

- Victor Manuel Lopez, Petitioner, and Johnathan Eliazar Merlo, Respondent, met on-line. At the time they met, [Merlo] was a foreign national living in Nicaragua and [Lopez], a U.S. citizen living in Houston.

- [Merlo] told [Lopez] that he wanted a long-term relationship. With the assistance of [Lopez], [Merlo] attempted to apply for a visitor's visa which was ultimately denied. After the visa was denied, [Merlo] claimed he was in love with [Lopez] and wanted to marry [Lopez].

- [Lopez] paid for [Merlo] to come to the United States on a K-1 visa.

- [Merlo] arrived from Nicaragua on November 19, 2016, via a K-1 visa, also known as a fiancé's visa. According to testimony, Parties were required to marry within 3 months to avoid [Merlo's] return to [his] country, due to the expiration of the K-1 visa.

- The Parties got their marriage license on January 11, 2017, and were to marry on January 21, 2019 [sic].

- [Lopez] called off the marriage, prior to the date to be married, due to [his] concerns regarding [Merlo's] commitment to the relationship.

9

- On January 22, 2017, an altercation took place and [Lopez] was arrested due to [Merlo's] representation that [Lopez] assaulted [him].

- On or about January 28, 2017, [Merlo] executed a statement along with an order of non-prosecution to drop the charges against [Lopez] for the alleged assault. [Merlo] admitted in the statement that [he] that had hit [Lopez], contrary to [Merlo's] statement to the police that resulted in [Lopez's] arrest. [Merlo] indicated the altercation ensued due to [his] unhappiness that [Lopez] had called off the wedding.

- [Merlo] was adamant . . . that [he] still wanted to marry [Lopez].

- The Parties were finally married on January 28, 2017.

- On February 21, 2017, without [Lopez's] knowledge, [Merlo] executed another affidavit/statement that he submitted to law enforcement authorities once again alleging that [Lopez] had hit [him], which was contrary to [his] previous statement in the affidavit of non[-]prosecution regarding the same incident.

- On March 30, 2017, [Lopez] was convicted, incarcerated and sentenced to six (6) years in prison for an unrelated DUI/DWI conviction. At that point[,] the Parties had lived together for 61 days.

- On May 4, 2017, [Merlo] removed [his] belongings from where [he] had lived with [Lopez].

- On May 5, 2017, [Merlo] informed [Lopez] that [he] was leaving and that [he] had gotten what [he] wanted—a marriage for immigration purposes. [Merlo] told [Lopez] that [his] immigration paperwork had arrived and that [he] had just "used" [Lopez] to get into the United States. Lopez testified that [Merlo] then "thanked" [him] and told [him] that [he] "no longer needed him." [Merlo] did not desire a long-term relationship.

- At the time [Lopez] discovered [Merlo's] fraud, [Lopez] was incarcerated, Thus, [Lopez] has not voluntarily cohabitated with [Merlo] after discovering [his] fraud. Had [Lopez] been given the opportunity, [Lopez] would not have voluntarily cohabitated with [Merlo] after the discovery of such fraud.

- After leaving May 5, 2017, [Merlo] also requested a Protective Order during the summer, on a default basis over 6 months after the incident in January and while [Lopez] was incarcerated. The Court signed a protective order on August 17, 2017.

- Also, after leaving May 5, 2017, [Merlo] filed for VAWA (Violence Against Women Act, an organization designed to protect abused spouses for citizenship). Upon filing[,] a person deemed eligible may extend the time allowed to stay in the United States.

- [Merlo] made representations to [Lopez] so that [Lopez] would marry [him] and thus [he] would be allowed to enter the United States, and to remain here without the unit of marriage with [Lopez] by making allegations of family violence and applying for VA[W]A.

Judge Dean concluded that the "annulment was granted on the grounds that fraud was used by [Merlo] to induce [Lopez] to enter into marriage" and that Lopez had "not voluntarily cohabitated with [Merlo] since learning of the fraud, and would not have done so if given the opportunity." Judge Dean further concluded that Merlo "failed to present evidence which would warrant granting a divorce."

**Late-Filed Findings of Fact and Conclusions of Law**

In his first issue, Merlo argues that we should set aside the decree of annulment and remand this matter for a new trial because Judge Dean, the judge who presided over the bench trial, did not timely file findings of fact and conclusions of

law. When Judge Dean filed her findings and conclusions—albeit late and during the pendency of this appeal—Merlo obtained leave to supplement his appellate briefing to argue that the belated findings and conclusions prevented him from properly presenting his appeal and were procedurally improper because Judge Dean lacked authority after her term expired. We address each of these contentions in turn.

## A.    The findings and conclusions were not too late.

"In any case tried in the district or county court without a jury, any party may request the court to state in writing its findings of fact and conclusions of law." TEX. R. CIV. P. 296. The party must file his request within twenty days after the court enters its judgment, and the court clerk must "immediately" bring the request "to the attention of the judge who tried the case." *Id.* The court must file its findings of fact and conclusions of law within twenty days of the timely request, and if the court fails to do so, the requesting party may file a notice of past due findings and conclusions within thirty days of the initial request. TEX. R. CIV. P. 297. A timely past-due notice extends the trial court's deadline to forty days from the party's initial request. *Id.*

If the trial court fails to file findings and conclusions in response to a proper and timely request, we must presume the trial court found all necessary facts that are supported by the evidence. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). A party may rebut the presumption by demonstrating that the

12

record evidence does not support a presumed finding. *Ad Villarai v. Chan Il Pak*, 519 S.W.3d 132, 135 (Tex. 2017).

If a court fails to file findings and conclusions when the facts are disputed, the burden of rebutting every presumed finding can be so burdensome that it effectively "prevent[s the appellant] from properly presenting its case to the court of appeals[.]" *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014). A trial court's failure to file findings in response to a timely and proper request is thus "presumed harmful, unless the record before [the] appellate court affirmatively shows that the complaining party has suffered no injury." *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989) (quotation omitted); *see also Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex. 1996) (per curiam) ("[H]arm to the complaining party is presumed unless the contrary appears on the face of the record when the party makes a proper and timely request for findings and the trial court fails to comply.").

Relying on these rules and legal principles, Merlo argues the decree of annulment must be set aside because he has been prevented from properly presenting his appeal. Merlo asserts two harms: (1) before the findings and conclusions were filed, he was required to speculate in his opening brief as to the trial court's reason for granting the annulment and, (2) after the findings and conclusions were filed, he was deprived of the opportunity to object and request additional or amended findings and conclusions because the trial court's plenary power had expired.

The issue here is not whether the decree of annulment must be set aside based on a presumption of harm because findings and conclusions were refused. The issue is whether Merlo has shown he suffered harm by the belated filing of the findings and conclusions. On this issue, this Court's decision in *Robles v. Robles*, 965 S.W.2d 605 (Tex. App.—Houston [1st Dist.] 1998, pet. denied), is controlling.

*Robles* involved analogous facts. Like Merlo, the *Robles* appellant timely requested findings and conclusions but, like Judge Dean, the trial court belatedly filed them after the appellant submitted his appellate brief. *Id.* at 610. The appellant asserted that the late filing deprived him of his opportunity to object or request additional findings and caused economic harm due to the added expense of preparing an amended brief. *Id.* He asked this Court to reverse and remand for a new trial. *Id.* But the Court refused, holding:

> The procedural rules establishing the time limits for the requesting and filing of findings of fact and conclusions of law do not preclude the trial court from issuing belated findings. Unless they can show injury, litigants have no remedy if a trial court files untimely findings and conclusions. Injury may be in one of two forms: (1) the litigant was unable to request additional findings, or (2) the litigant was prevented from properly presenting his appeal. If injury is shown, the appellate court may abate the appeal so as to give the appellant the opportunity to request additional or amended findings in accordance with the rules.

*Id.* (citations omitted).

Although the trial court in *Robles* had prepared and filed its findings and conclusions in an untimely manner, the appellant did not show harm. *Id.* at 611. The

14

Court reasoned that the appellant "was not denied the opportunity to properly present his appeal, because after the record was supplemented, [the appellant] was granted leave to file an amended brief addressing the untimely filed findings and conclusions." *Id.* In addition, the appellant was not prevented from objecting and requesting additional findings of fact or conclusions of law because the rules of court permitted him to file a request for specified additional or amended findings or conclusions within ten days. *Id.* (citing TEX. R. CIV. P. 298). The Court concluded that "a trial court may file additional findings even after it loses plenary power to affect the judgment" and that "the failure to request additional findings of fact and conclusions of law constitutes a waiver on appeal of the trial court's lack of such findings and conclusions." *Id.*; *see Cherne*, 763 S.W.2d at 773 (instructing court of appeals to direct trial court to file findings long after plenary power had expired); *Tenery*, 932 S.W.2d at 30 (same); *see also Jefferson Cty. Drainage Dist. No. 6 v. Lower Neches Valley Auth.*, 876 S.W.2d 940, 959 (Tex. App.—Beaumont 1994, writ denied) ("[T]he expiration of the trial bench's 'plenary power' over its judgment does not affect or diminish the trial court's ability to make and file amended findings of fact and conclusions of law.").

The same result is compelled here. Judge Dean signed the decree of annulment on November 14, 2018. Merlo timely requested findings of fact and conclusions of law nineteen days later, on December 3, 2018, and then timely notified the trial court

15

on December 31, which was the last day of Judge Dean's term, that the findings and conclusions were past due. Merlo's past-due notice extended the deadline for the findings and conclusions to January 14, 2019. When findings and conclusions still had not been filed upon the expiration of both Judge Dean's term and the extended forty-day deadline, Merlo complained to the now-presiding judge, Judge Dunson, at a post-judgment hearing. Judge Dunson stated that Judge Dean would still file findings and conclusions. On September 20, 2019, Judge Dean did so, well beyond the expiration of the plenary period and two months after Merlo filed his opening brief in this appeal.

Merlo filed his reply brief on December 4, 2019 and requested that his reply be treated as a supplement to his "original brief with arguments regarding [Judge Dean's] later issued findings." Shortly after the findings and conclusions became a part of the appellate record in a supplemental clerk's record filed on July 24, 2020, this Court granted Merlo's request to treat his reply brief as a supplemental brief. The Court also granted leave for Lopez to file a supplemental response, which Lopez did file, and for Merlo to have the last word in a sur-reply, which Merlo did file.

Applying *Robles*, we conclude Merlo has not shown harm resulting from the untimely filing of Judge Dean's findings and conclusions. Merlo was not denied the opportunity to present his appeal because, after the findings and conclusions were filed, he was granted leave to supplement his appellate briefing to address the

16

untimely filed findings and conclusions. *See Robles*, 965 S.W.2d at 611. Nor was he prevented from objecting and requesting additional findings and conclusions, as the rules permitted him to do so within ten days after Judge Dean filed her findings and conclusions even though the trial court no longer had plenary power to affect the judgment. *Id.*; *see Ad Villarai*, 519 S.W.3d at 141 (rejecting argument that court cannot file findings of fact after plenary power expires). Merlo did not file a request for additional findings or conclusions with the trial court, and neither party asked this Court to abate the appeal for the trial court to make additional findings and conclusions.

We therefore hold that Merlo has not been deprived of his ability to properly present his appeal because of the late filing of Judge Dean's findings of fact and conclusions of law. We overrule that portion of Merlo's first issue complaining of the late filing of Judge Dean's findings and conclusions.

**B.** **The former judge did not lack authority to file findings and conclusions.**

In the remaining portion of his first issue, Merlo argues Judge Dean lacked authority to file findings and conclusions because no order of assignment authorized her to act after her term expired. Merlo rests this argument on Chapter 74 of the Texas Government Code, which he contends establishes the framework for "how a prior judge can be authorized temporarily as a judge for certain cases" and requires "several steps, including notification of both parties as well as the issuance of an

17

order of assignment." We disagree that the absence of an order of assignment in the appellate record requires us to disregard Judge Dean's findings and conclusions.

Chapter 74 of the Texas Government Code, the Court Administration Act, provides that retired and former judges may be assigned "to hold court when necessary to dispose of accumulated business in [an administrative judicial] region," provided they meet the statutory requirements. TEX. GOV'T CODE § 74.052. Section 74.053—the provision on which Merlo rests his challenge to Judge Dean's authority to file findings and conclusions after the expiration of her term—provides in pertinent part:

(a)     When a judge is assigned to a trial court *under this chapter*:

    (1)     the order of assignment must state whether the judge is an active, former, retired, or senior judge; and

    (2)     the presiding judge shall, if it is reasonable and practicable and if time permits, give notice of the assignment to each attorney representing a party to the case that is to be heard in whole or part by the assigned judge.

(b)     If a party to a civil case files a *timely* objection to the assignment, the judge shall not hear the case.

TEX. GOV'T CODE § 74.053(a), (b) (emphasis added).

Lopez argues that section 74.053 does not apply in this case because "Judge Dean was needed to make findings and conclusions in a case she had presided over before she left the bench," not "because of accumulated business in the region." Lopez urges us to look instead to section 30.002(a) of the Texas Civil Practice and

18

Remedies Code as the source of Judge Dean's authority to file findings and conclusions after the expiration of her term. Section 30.002(a) provides:

> If a district or county judge's term of office expires . . . during the period prescribed for filing . . . findings of fact and conclusions of law, the judge may . . . file findings of fact and conclusions of law in the case.

TEX. CIV. PRAC. & REM. CODE § 30.002(a).

In this case, we need not decide whether section 30.002(a) of the Civil Practice and Remedies Code eliminates the need for an order of assignment under Chapter 74 of the Government Code because Merlo's challenge to the omission of an order of assignment is not properly presented for our review. In support of the challenge in his opening brief to what, at that time, was a failure of Judge Dean to timely file findings and conclusions, Merlo characterized Judge Dunson's statement on the record of the new-trial hearing as an "oral order that Judge Dean would submit the past due findings of fact and conclusions of law." Merlo described Judge Dunson's order as "the solution prescribed by the [Texas] Supreme Court" in *Ad Villarai*,[4] a case we discuss below. The record reflects that Merlo did not object at the hearing to Judge Dean filing findings and conclusions or at any other time before her findings and conclusions were filed. Nor did he object to the lack of a written assignment order. And Merlo has not disputed Judge Dean's legal qualifications to file findings and conclusions.

---

[4] *See Ad Villarai, LLC v. Chan Il Pak*, 519 S.W.3d 132 (Tex. 2017).

19

In more than one case, courts have recognized that an appellant may not object, for the first time on appeal, to a procedural irregularity in the assignment of a former judge who is otherwise qualified. *See Wilson v. State*, 977 S.W.2d 379, 380–81 (Tex. Crim. App. 1998) (holding that appellant challenging authority of qualified judge to preside pursuant to an expired assignment must make timely objection); *Jackson v. State*, No. 05-10-01190-CR, 2012 WL 955361, at *2–3 (Tex. App.—Dallas Mar. 22, 2012, no pet.) (not designated for publication) (presuming that former judge was properly assigned when appellant did not object and only basis for appellant's assertion that judge was not statutorily qualified to sit was absence of formal order of appointment in record); *see also* TEX. GOV'T CODE § 74.053(b) (requiring timely objection to assignment of former judge). Although these holdings are in the context of criminal appeals, we find no reason to reach a different result in this civil appeal. *See* TEX. R. APP. P. 33.1(a)(1) (providing that "[a]s a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a timely request, objection, or motion" and trial court ruled or refused to rule on request, objection, or motion); *see also USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 511–13 (Tex. 2018) (noting that error preservation rules apply except in cases of fundamental error and discussing narrow category of errors that fall within that category).

20

Moreover, Merlo has not disputed that Judge Dean's findings and conclusions fall within the circumstance contemplated in section 30.002(a) of the Civil Practice and Remedies Code. The prescribed period for filing findings of fact and conclusions of law in this case was extended by Merlo's timely filing of a past-due notice until January 14, 2019. *See* TEX. R. CIV. P. 297. Judge Dean's term of office expired before the expiration of the prescribed period and, thus, she was permitted by the plain language of section 30.002(a) to file her findings and conclusions. *See* TEX. CIV. PRAC. & REM. CODE § 30.002(a) ("If a district or county judge's term of office expires . . . during the period prescribed for filing . . . findings of fact and conclusions of law, the judge may . . . file findings of fact and conclusions of law in the case.").

The Texas Supreme Court's opinion in *Ad Villarai* confirms the statute's application in this case. There, on similar facts, the Court held that a former judge who presided over a bench trial had statutory authority under section 30.002(a) to file findings of fact after the expiration of his term. *See* 519 S.W.3d at 140 ("Here, because Judge Lowy's term of office expired on December 31, 2014, which was within the period for filing the findings Pak requested, section 30.002(a) granted Judge Lowy authority to file the findings even after his term expired."). The Court further held that the expiration of the trial court's plenary power did not preclude the former judge from filing findings, reasoning:

> Section 30.002(a) expressly grants a judge whose term has expired during the period for filing findings authority to file findings and

21

imposes no temporal limitation on that authority. Nor do our rules impose any such limitation. The leniency of the rule allows a trial court judge to file late findings on her own volition or at the behest of the court of appeals.

*Id.* at 141 (citations omitted); *see also Larry F. Smith, Inc. v. The Weber Co., Inc.*, 110 S.W.3d 611, 616 (Tex. App.—Dallas 2003, pet. denied) (explaining that "preferred remedy" for outstanding findings is to abate appeal to allow trial judge to file findings).

Because Merlo did not object to the omission of an order of assignment under the Government Code and because Judge Dean's findings and conclusions are authorized by the Civil Practice and Remedies Code, we reject Merlo's request to disregard the findings and conclusions. We overrule the remaining portion of Merlo's first issue.

## Sufficiency of the Evidence

Section 6.107 of the Texas Family Code authorizes a trial court to grant an annulment of a marriage to a party upon two showings: "(1) the other party used fraud . . . to induce the petitioner to enter into the marriage; and (2) the petitioner has not voluntarily cohabitated with the other party since learning of the fraud[.]" TEX. FAMILY CODE § 6.107. In his second and third issues, Merlo argues that the trial court erred by granting an annulment instead of a divorce because the evidence was legally insufficient as to both statutory elements.

22

## A.    Standard of review

We review conclusions of law de novo. *See Marchand*, 83 S.W.3d at 794. Findings of fact in a case tried to the court have the same force and dignity as a jury's verdict upon jury questions. *Leax v. Leax*, 305 S.W.3d 22, 28 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The trial court's findings of fact are not conclusive when we have a complete reporter's record. *Id.* The findings of fact are reviewable for sufficiency of the evidence using the same standards that are applied in reviewing the sufficiency of the evidence underlying jury findings. *Id.*

When, as here, the appellant attacks the legal sufficiency of an adverse finding on an issue for which he did not have the burden of proof, he must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Leax*, 305 S.W.3d at 28. In a legal sufficiency, or "no-evidence," review, we determine whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In conducting this review, we credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.* We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.* at 822. We must sustain a no-evidence contention only if (1) the record reveals a complete absence of evidence of a vital fact, (2) the court is barred

by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810; *Leax*, 305 S.W.3d at 28.

The fact finder is the sole judge of witness credibility; it may choose to believe one witness over another. *City of Keller*, 168 S.W.3d at 819; *Leax*, 305 S.W.3d at 28. Because it is the fact finder's province to resolve conflicting evidence, we must assume that the fact finder resolved all evidentiary conflicts in accordance with its decision if a reasonable person could have done so. *City of Keller*, 168 S.W.3d at 819; *Leax*, 305 S.W.3d at 28. An appellate court may not impose its own opinion to the contrary of the fact finder's implicit credibility determinations. *City of Keller*, 168 S.W.3d at 819; *Leax*, 305 S.W.3d at 28–29.

## B.    There is legally sufficient evidence of fraudulent inducement.

In his second issue, Merlo argues that the evidence is legally insufficient to support the trial court's conclusion that Merlo fraudulently induced Lopez into the marriage for the purpose of entering the United States.[5] Merlo challenges several

---

[5]    In his opening brief, Merlo also argued that there was no evidence to support a finding that the marriage should be annulled based on fraud related to securing Lopez's financial support. However, the belated findings do not include any findings of financial fraud, and thus that is not a basis of the trial court's judgment.

specific findings, which he asserts are the basis of the trial court's decree of annulment—namely, the findings that:

- On or about January 28, 2017, [Merlo] executed a statement along with an order of non-prosecution to drop the charges against [Lopez] for the alleged assault. [Merlo] admitted in the statement that [he] had hit [Lopez], contrary to [his] statement to the police that resulted in [Lopez's] arrest. [Merlo] indicated the altercation ensued due to [his] unhappiness that [Lopez] had called off the wedding.

- On February 21, 2017, without [Lopez's] knowledge, [Merlo] executed another affidavit/statement that he submitted to law enforcement authorities once again alleging that [Lopez] had hit [him], which was contrary to [his] previous statement in the affidavit of non[-]prosecution regarding the same incident.

- On May 5, 2017, [Merlo] informed [Lopez] that [he] was leaving and that [he] had gotten what [he] wanted—a marriage for immigration purposes. [Merlo] told [Lopez] that [his] immigration paperwork had arrived and that [he] had just "used" [Lopez] to get into the United States. Lopez testified that [Merlo] then "thanked" [him] and told [him] that [he] "no longer needed him." [Merlo] did not desire a long-term relationship.

- [Merlo] made representations to [Lopez] so that [Lopez] would marry [him] and thus [he] would be allowed to enter the United States, and to remain here without the unit of marriage with [Lopez] by making allegations of family violence and applying for VA[W]A.

Each of these challenged findings rests on a determination of the credibility of the witnesses. For example, Merlo argues that the trial court erred by finding that he hit Lopez during the pre-marriage altercation based on language in the non-prosecution letter admitting only that Merlo "attempted to punch" Lopez. While

25

the admission in the non-prosecution letter may have been phrased as something short of physical contact, Lopez testified that when he initially called off the couple's wedding, Merlo responded "violently" and "hit" Lopez. As the sole judge of the credibility of the witnesses, the trial court was permitted to believe Lopez's testimony. *See City of Keller*, 168 S.W.3d at 819.

Similarly, Merlo argues that the trial court erred by finding that Merlo asserted that Lopez was the first aggressor in a handwritten "Complainant Statement" submitted in February 2017, one month after the altercation, because the finding is contrary to Merlo's testimony that he simply misdated the statement. Again, the trial court was permitted to weigh to the documentary evidence more heavily than Merlo's testimony that the handwritten statement included an erroneous date. *See id.*

Merlo also asserts that the trial court could not reasonably conclude that he left the marriage because he had gotten what he wanted, "a marriage for immigration purposes." In light of Lopez's testimony that Merlo admitted that was his intention in entering the marriage, we disagree. Regarding his final telephone call with Merlo on May 5, 2017, Lopez testified:

> I remember that day. It was a Friday and that was our last conversation we had on the phone. . . . [T]hat's when he . . . verbally told me, . . . "Well, I married you. I got what I wanted," and – you know, he won. He wanted his immigration paperwork and that's it. He used me. I was shocked.

26

. . .

> He told me . . . that all he wanted to do was get his immigration paperwork. That's the only reason he married me, and I was shocked. I felt betrayed and lied to and used.

Lopez also testified that he learned from his mother that Merlo picked up his employment authorization card on the day before this call and left the shared home.

Based on this testimony, the trial court could reasonably infer that Merlo's expression of a desire for a long-term relationship was a false representation at the time he made it, was for the purpose of entering the United States, and caused Lopez injury in the form of grief.[6] *See Leax*, 305 S.W.3d at 29 (noting in the context of annulment of marriage that fraudulent inducement is established by proof "that a false material representation was made that (1) was known to be false when it was made, (2) was intended to be acted upon, (3) was relied upon, and (4) caused injury"); *see also Desta v. Anyaoha*, 371 S.W.3d 596, 598–99 (Tex. App.—Dallas 2012, no pet.) (holding that evidence was legally and factually sufficient to support trial court's finding that husband was induced to enter into marriage by immigration-related fraud). Contrary to Merlo's suggestion, the finding is not erroneous if the purported fraud was unsuccessful and did not actually achieve any

---

[6] The judgment can be affirmed on the basis of these findings alone, and thus we need not consider Merlo's final challenge as to whether there was legally sufficient evidence that he intended before marriage to make a claim of family violence and apply for protection under the Violence Against Women Act. *See* TEX. R. APP. P. 47.1.

27

immigration status for Merlo, as that is not an element of fraudulent inducement of a marriage. *See Leax*, 305 S.W.3d at 29. Nor is it an issue before us.

Because our review of the record reveals legally sufficient evidence from which a reasonable fact finder could infer that an annulment should be granted on the basis of fraud, we overrule Merlo's second issue.

**C.     There is legally sufficient evidence that Lopez did not voluntarily cohabitate with Merlo after discovering the fraud.**

In his third issue, Merlo argues that the trial court could not reasonably conclude that Lopez had not voluntarily cohabitated with Merlo since discovering the fraud because Lopez ceased living with Merlo due to his involuntary incarceration, not due to any choice on Lopez's part. We disagree.

A principle tenet of statutory construction is that we must enforce a statute "as written" and "refrain from rewriting text that lawmakers chose." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009). We limit our analysis to the words of the statute and will not insert language into the statute that is not there. *See Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014); *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 649 n.41 (Tex. 2007) (noting that courts "should not by judicial fiat insert non-existent language into statutes").

The second statutory element for an annulment is that "the petitioner has not voluntarily cohabitated with the other party since learning of the fraud[.]" TEX. FAM. CODE § 6.107(2). Merlo's argument on appeal requires us to consider whether the

28

undisputed fact of Lopez's incarceration precluded, as a matter of law, a finding that Lopez satisfied this statutory element because the incarceration was an impediment to voluntary cohabitation. Although the Family Code does not define the phrase "has not voluntarily cohabitated," Merlo argues that because Lopez was incarcerated at the time he discovered the fraud in the May 5, 2017 telephone call, "Lopez can only show that he has 'not cohabitated' with Merlo since going to prison."

In support of his argument that there must be evidence Lopez voluntarily chose not to cohabitate with Merlo after learning of the fraud and that an incarcerated person lacks freedom to choose his residence, Merlo cites a number of cases in which he asserts the courts have considered whether a party's action or decision was voluntary in other contexts. *See, e.g.*, *Almanza v. Salas*, No. 14-12-01114-CV, 2014 WL 554807, at *5 (Tex. App.—Houston [1st Dist.] Feb. 11, 2014, no pet.) (mem. op.) (real property dispute); *In re Marriage of Lassmann*, No. 13-09-00703-CV, 2010 WL 3377773, at *2 (Tex. App.—Corpus Christi-Edinburg Aug. 25, 2010, no pet.) (mem. op.) (child support); *In re D.J.J.*, 178 S.W.3d 424, 429 (Tex. App.—Fort Worth 2005, no pet.) (termination of parental rights). These cases are distinguishable from this case and not instructive.

For example, in *Marriage of Lassmann*, the court considered whether a parent incarcerated for family violence was voluntarily unemployed such that the trial court had statutory authority to order the parent to pay more child support than the

29

guidelines indicated. *See* 2010 WL 3377773 at *2. We note that although the court used the phrase "voluntary unemployment" in its opinion, the phrase actually used in the relevant Family Code provision is "intentional unemployment." *See* TEX. FAM. CODE § 154.066(a). Nevertheless, the court concluded that the incarceration was not "voluntary unemployment because the child support order at issue was not in place at the time [the incarcerated parent] committed the assault." *In re Marriage of Lassmann*, 2010 WL 3377773, at *2. The dispositive facts were that the parent "was incarcerated five months before [the spouse] filed for divorce, and nine months before the divorce hearing where the child support award was determined," and thus there was "no evidence [the parent] had any 'intent' to be underemployed or unemployed for the purpose of decreasing a child support award." *Id.*

In another case cited by Merlo—*In re D.J.J.*—the court considered whether the evidence supported a termination of parental rights on the ground that an incarcerated parent voluntarily left his child alone or in the possession of another. 178 S.W.3d at 429; *see* TEX. FAM. CODE § 161.001(b)(1)(C) ("The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence (1) that the parent has (A) voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return."). The court concluded that the parent's separation from the child "was not voluntary because [the parent] was incarcerated before [the child] was born." *Id.* at 429.

And in the final case cited by Merlo—*Almanza v. Salas*—the court considered whether the fact of a homeowner's incarceration was evidence of a voluntary abandonment of the homestead such that his real property could be levied upon to enforce a judgment against the homeowner. 2014 WL 554807 at *5. Without any analysis, the court concluded it was not. *Id.*

Although in each of these cases the court equated incarceration with an absence of intent or choice, they are not controlling here. Our analysis must be guided by the statutory text. *See Entergy Gulf States*, 282 S.W.3d at 443. As Lopez points out, the fact of his incarceration does not preclude a finding that he has not voluntarily cohabited with Merlo since learning of the fraud. The statutory language includes a single active verb: "cohabitate." *See* TEX. FAM. CODE § 6.107(2). Although "voluntarily," an adverb, modifies "cohabitate," the statutory inquiry is not whether there was an impediment to cohabitation. It is whether if there was cohabitation at all, it was not voluntary. *See id.* In other words, if Lopez had cohabitated with Merlo after learning of the fraud, the inquiry would be whether he did so "voluntarily." Because Lopez did not cohabitate with Merlo after learning of the fraud, voluntariness is not at issue.

To read the statute as Merlo does would require us to transpose the text to require that Lopez prove he "voluntarily *has not* cohabitated" with Merlo. Based on well-established principles of statutory construction, we do not rewrite the statutory

31

text. *See Fortis Benefits*, 234 S.W.3d at 649 n.41; *see also MCI Sales and Serv., Inc. v. Hinton*, 329 S.W.3d 475, 502 (Tex. 2010) (rejecting argument that would compel court to read non-existent language into definition of "settling person" in proportionate responsibility statute).

It is undisputed that Merlo and Lopez ceased living together as a married couple in the home of Lopez's brother on March 30, 2017, when Lopez was incarcerated after being convicted of a felony offense. Lopez testified that he discovered Merlo's fraud on May 5, 2017, when Merlo told Lopez over the phone that he had entered the marriage for immigration purposes. Lopez has not cohabitated with Merlo since before that date. On this record, we conclude there was legally sufficient evidence to support the trial court's finding that Lopez did not voluntarily cohabitate with Merlo after discovering the fraud.

We overrule Merlo's third issue.

## Conclusion

We affirm the judgment of the trial court.

Amparo Guerra
Justice

Panel consists of Justices Goodman, Landau, and Guerra.